UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-08-155-B-W |
| | ) | |
| SHARON L. FOREST | ) | |

**ORDER GRANTING DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA**

Although the motion presents an unusually close case, the Court grants the Defendant's request to withdraw her guilty plea to Count Ten of the Superseding Indictment.

I.      **STATEMENT OF FACTS**

A.      **Case History**

On August 13, 2008 in a four count indictment, a federal grand jury indicted Sharon L. Forest for theft of public money, a violation of 18 U.S.C. § 641; false statements, a violation of 18 U.S.C. § 1001; fraud in connection with access devices, a violation of 18 U.S.C. § 1029(a)(2); and aggravated identity theft, a violation of 18 U.S.C. § 1028A. *Indictment* (Docket # 1). On November 12, 2008, a grand jury issued a superseding indictment containing ten counts, including six counts of mail fraud, a violation of 18 U.S.C. § 1341, along with the prior charges of theft of public money, false statements, fraud in connection with access devices, and aggravated identity theft. *Superseding Indictment* (Docket # 32). On March 17, 2009, Ms. Forest appeared before the Court and entered a conditional guilty plea to Counts Seven and Ten, the theft of public money and aggravated identity theft counts. *Minute Entry* (Docket # 66).[1, 2]

---

[1] The Government agreed to dismiss Counts I through VI, VIII, and IX after sentencing. *Agreement to Plead Guilty* (Docket # 64) (*Plea Agreement*).

[2] At the Rule 11 hearing, the Court was concerned about whether the Government could charge a § 1028A violation as a stand-alone offense without also charging an underlying predicate crime, and the Defendant pleaded guilty conditionally to preserve the right to challenge that issue. About a month after Ms. Forest pleaded guilty, the First

The Court ordered the preparation of a presentence report, and it appeared that Ms. Forest would be sentenced in the ordinary course.

She was not. Ms. Forest persistently delayed her sentencing hearing. At first the delay was routine. On May 19, 2009, defense counsel asked for a one week extension to object to the presentence report on the ground that his workload had unexpectedly increased. *Def.'s Unopposed Mot. to Extend Time for Filing PSR Obj.* (Docket # 68). The Court granted the motion on May 19, 2009. *Order* (Docket # 69). Defense counsel then wrote the Court to ask that the sentencing hearing be scheduled for late July to allow Ms. Forest to attend medical appointments, and on June 17, 2009, the case was set for sentencing on July 29, 2009. *Notice of Hearing* (Docket # 71). On July 15, 2009, defense counsel moved to continue the sentencing hearing because he was going on vacation. *Def.'s Mot. to Cont. Sentencing* (Docket # 72). The Court granted the motion and set the case for presentence conference and sentencing on August 4, 2009. *Order* (Docket # 73).

On July 23, 2009, however, Ms. Forest again moved to continue the sentencing hearing, stating that Ms. Forest's doctor had recommended she consult with a hand surgeon to determine whether she should undergo joint arthroplasties to address advanced arthritis in her hands. *Def.'s Second Mot. to Cont. Sentencing* (Docket # 75). Dr. Kathleen McCall, her treating physician, wrote that if there were a delay in treatment, Ms. Forest would be "at risk for crippling dysfunction in both hands." *Id.* Ex. 1 at 1. Based on this representation, the Court continued the sentencing hearing to allow Ms. Forest to undergo the surgical consultation and possible surgery. *Order* (Docket # 78). In late September, 2009, Dr. McCall wrote a letter listing all of Ms.

---

Circuit strongly suggested that the Government could proceed with a violation of § 1028A as a stand-alone offense. *United States v. Stepanian*, 570 F.3d 51, 60 n.15 (1st Cir. 2009) (stating that "[t]o the extent Stepanian wishes to argue that the government must separately allege and charge the predicate crime in order to charge a § 1028A offense[,] . . . the statutory language lends no support to that proposition").

Forest's diagnoses and urging the Court to impose house arrest or if not, incarceration at a medical facility. In the fall of 2009, Ms. Forest underwent surgery and on October 7, 2009, defense counsel informed the Court that the hand surgeon estimated that the shortest time in which Ms. Forest could recuperate from her hand surgeries was six to nine months. Accordingly, on October 13, 2009, the Court set the case ahead for further conference on April 27, 2010. *Notice of Hearing* (Docket # 83).

At the April 27, 2010 conference, defense counsel informed the Court that a motion to withdraw the guilty plea might be filed, and on May 4, 2010, Ms. Forest filed the motion. *Def.'s Mot. to Withdraw Guilty Plea* (Docket # 85) (*Def.'s Mot.*). The Court set a hearing on the motion for May 17, 2010, but the Government moved to continue the hearing based on the need to file a memorandum of law and to meet with the victim. *Mot. of the United States of Amer. to Cont. Hearing on Def.'s Mot. to Withdraw Guilty Plea* (Docket # 90). The Court granted the Government's motion and reset the hearing for May 28, 2010, which was later changed to May 27, 2010. *Order* (Docket # 95); *Second Notice of Rescheduled Hearing* (Docket # 96).[3] On May 24, 2010, the Government filed an objection to the Defendant's Motion to Withdraw Guilty Plea. *Obj. of the United States of Amer. to Mot. to Withdraw Guilty Plea* (Docket # 98) (*Gov't's Obj.*). The Court held a hearing on May 28, 2010, but the evidence was not completed. *Minute Entry* (Docket # 109). On June 3, 2010, the Government submitted a supplemental memorandum in support of its objection to the Defendant's Motion to Withdraw Guilty Plea. *Supp. Mem. in*

---

[3] On the morning of the scheduled hearing, Ms. Forest moved to continue, stating that she had been planning to ride from Fort Kent to Bangor with Richard Myers, one of the subpoenaed witnesses. However, when Mr. Myers decided not to attend, Ms. Forest was unable to travel to Bangor. *Def.'s Mot. to Cont. Hearing on Mot. to Withdraw Plea* (Docket # 99). This motion caused a series of conferences with the Court on May 27, since the Government's witnesses had traveled from Fort Kent and Portland to Bangor for the hearing. The result was that part of the hearing was held the next day.

*Support of Obj. of the United States to Def.'s Mot. to Withdraw Guilty Plea* (Docket # 121) (*Gov't's Supp. Mem.*). On June 10, 2010, the Court held the second part of the hearing.

### B. The Defendant's Motion to Withdraw the Guilty Plea to Count Ten

Although Ms. Forest pleaded guilty to two counts, Count Seven, theft of public money, and Count Ten, aggravated identity theft, she seeks to withdraw her guilty plea only to Count Ten. *Def.'s Mot.* at 5 (stating that "Ms. Forest is guilty of the charge in Count 7 and will not seek to withdraw her plea thereon").[4] Count Ten, the aggravated identity theft charge, reads:

> Beginning on about September 13, 2005 and continuing to March 14, 2007, in the District of Maine, the defendant Sharon L. Forest knowingly used, without lawful authority, a means of identification of another person, namely Social Security number xxx-xx-7070, during and in relation to fraud in connection with an access device, in violation of Title 18, United States Code, Section 1029(a)(2).

*Superseding Indictment* at 4. The Prosecution Version, which she admitted was true during the Rule 11, states in part:

> Fort Kent Officer Richard Martin would testify in the July 5, 2007 interview that defendant Sharon Forest admitted she had applied for, received and used for her own personal gain from September, 2005 through March, 2007 five credit cards from Bank of America, HSBC, Washington Mutual and Chase Banks in the name of Wallace Bouchard. Defendant Forest confessed to Officer Martin that she applied for the credit cards in Mr. Bouchard's name because she believed applications for the cards in her own name would not have received approval. The defendant further acknowledged to the Fort Kent police officer that she made charges on the credit card accounts with knowledge that she did not have the ability to pay for the debt that she was incurring. A sworn statement signed by the defendant containing her admissions regarding her knowing and fraudulent intent to use the credit cards would be introduced into evidence through the testimony of Officer Martin.

> Postal Inspector Michael Desrosiers would testify that Sharon Forest admitted during the May 20, 2008 interview of the defendant that she knowingly used the identity of Wallace Bouchard, as well as Mr. Bouchard's social security number and date of birth, without his approval and without lawful authority with the intent

---

[4] The Defendant was under the impression she pleaded guilty to Counts One through Seven and Eight through Ten. *Def.'s Mot.* at 1 (stating that she "moves to withdraw her guilty plea in this matter as to counts 1 through 6 and 8 through 10 of the Super[s]eding Indictment"). This is incorrect. Ms. Forest pleaded guilty only to Counts 7 and 10.

4

to unlawfully apply for and receive the six following credit cards: two Chase credit cards, two HSBC credit cards, a Bank of America credit card and a Washington Mutual credit card. Inspector Desrosiers would add that the defendant confessed she had knowingly planned in advance and obtained money from the six credit card companies under false pretenses and by making false statements and false representations when she applied for the six credit cards. Defendant Forest further conceded that she had used the name of Wallace Bouchard when she completed applications for the 6 credit cards when in truth and fact as she very well knew that she was the real applicant and recipient of the credit cards. In addition to the above admissions, Forest confessed in a written declaration that Wallace Bouchard was not aware that she was using credit cards received under his name.

Applications admitted into evidence would show the defendant used Social Security Number xxxx-xx-7070, during and in relation to fraud in connection with the six credit cards. Statements from the six credit card companies would be admitted into evidence and would establish that the defendant from March 14, 2006 through March 14, 2007 obtained items with use of the credit cards which had value aggregating in excess of $1,000 during that time period. Defendant's intent to defraud would further be proven with use of evidence that she had filed an application with the U.S. Postal Service for Post Office Box in the name of Wallace Bouchard in order to conceal her applications for credit cards . . . when in truth and fact as very well known by the defendant, Mr. Bouchard was not an applicant for a Post Office Box.

*Gov't's Proposal of Facts and Version of Offenses* at 3-5 (Docket # 62) (*Pros. Version*).

The immediate cause for Ms. Forest's motion is that two witnesses overheard Mr. Bouchard "make admissions inconsistent with his statements to investigators and exonerating as to Ms. Forest." *Def.'s Mot.* at 1. Ms. Forest says that a man named James Kutz stated that in approximately June or July, 2007, Mr. Bouchard, the alleged victim, "admitted knowledge of the existence of the credit cards and the post office box." *Id.* at 2. Mr. Kutz allegedly overheard Mr. Bouchard make this statement at Delbart Daigle's garage in Fort Kent, when Mr. Bouchard was responding to a comment about the fact "he had kicked Ms. Forest out of his house." *Id.* Mr. Kutz recalled that Mr. Bouchard "appeared to think it was 'kind of a joke' that he had lied to the police about his knowledge regarding those two issues." *Id.* Mr. Kutz heard Mr. Bouchard state "in essence, that he knew about the post office box and the credit cards but that Ms. Forest had

gone overboard and run up too much debt" and that as he had a new girlfriend, he "did not feel that he was responsible for the credit card debt." *Id.*

The second witness is Richie Myers.[5]  Mr. Myers allegedly was aware that "Mr. Bouchard actually did know about the Post Office box at the time he reported to the police that he knew nothing." *Id.* at 2-3.  Mr. Myers also said he "thought Mr. Bouchard believed it was funny that he had made an apparently false statement to the police." *Id.* at 3.  Mr. Myers finally said that "Mr. Bouchard also stated that he actually knew about the credit cards at the time he reported to the police that he knew nothing." *Id.*

Ms. Forest urges the Court to allow her to withdraw her March 17, 2009 guilty plea arguing that the newly-acquired evidence demonstrates that "she was actually innocent" of the crime of aggravated identity theft. *Id.* at 4.  She explains that Mr. Bouchard "pre-empted her defense by lying to federal investigators, claiming ignorance, playing the victim, and blaming Ms. Forest." *Id.* at 5.  She pleaded guilty, she says, because she knew she was guilty of Count Seven and a denial of guilt on Count Ten would have seemed "overly defensive instead of factual." *Id.*  Even though she was aware of Mr. Myers' statements as of October 7, 2009, she was unaware of Mr. Kutz's statement until April 25, 2010, and she filed the motion to withdraw within days of learning about Mr. Kutz's corroboration of Mr. Myers.

C.    **The Government's Response**

The Government argues that Ms. Forest has failed to meet any of the five primary requirements under First Circuit law for the withdrawal of a guilty plea, and if she has met those requirements, the prejudice to the Government compels denial of the motion. *Gov't's Obj.* at 2-8.

---

[5] Mr. Myers' given name is William Richard Myers, but he goes by Richie.

Moreover, the Government presents significant counterevidence to Ms. Forest's contentions. Ms. Forest's motion is grounded on a report by a private investigator who interviewed both Mr. Myers and Mr. Kutz. In its responsive memorandum, the Government presents a sworn statement by Mr. Myers that asserts the investigator's affidavit does not accurately reflect what he told him. He says instead that he told the private investigator "that in the Summer of 2009 I was at Daigle's Garage and I overheard a conversation between Mr. Bouchard and Mr. Daigle. I heard Wallace say that he went to the Post Office to open a P.O. Box and the postman never informed him that he already had a P.O. Box." *Id.* Attach. 1 at 1.

The Government also presented an affidavit from James Kutz, which acknowledges that he made the statement contained in the investigator's affidavit but adds:

> The statement that I had provided to Mr. Magnus P.I. was completely false. I made it up to help out my neighbor Sharon F. I have only been to Mr. Daigle's garage one time last summer and Mr. Bouchard wasn't even there.

*Id.* Attach. 3 at 1.

## II.   DISCUSSION

### A.   Legal Standards

Rule 11(d) addresses the withdrawal of a guilty plea after the plea has been accepted but before sentencing. Fed. R. Crim. P. 11(d)(2)(B). The Rule provides that at this stage a defendant may withdraw a plea of guilty if "the defendant can show a fair and just reason for requesting the withdrawal." *Id.* A defendant has no absolute right to withdraw a plea and the burden of persuasion rests upon the defendant. *United States v. Castro-Gómez*, 233 F.3d 684, 686-87 (1st Cir. 2000); *United States v. Marrero-Rivera*, 124 F.3d 342, 347 (1st Cir. 1997). Whether to grant a motion for withdrawal of guilty plea rests in the sound discretion of the

sentencing court and is reviewed for an abuse of discretion. *Castro-Gómez*, 233 F.3d at 686; *United States v. Ribas-Dominicci*, 50 F.3d 76, 78 (1st Cir. 1995).

The First Circuit has identified five factors to assess whether the defendant's reasons justify withdrawal: 1) whether the plea was voluntary, intelligent, and knowing when made and complied with Rule 11; 2) the force of the defendant's reason for the change of plea; 3) the timing of the request; 4) whether the defendant asserts actual innocence; and, 5) whether a plea agreement had been made. *United States v. Richardson*, 225 F.3d 46, 51 (1st Cir. 2000). Before allowing a defendant to withdraw his plea, the court must also consider the potential prejudice to the government. *Id.* (citing *Marrero-Rivera*, 124 F.3d at 347).

### B.      The Guilty Plea: Voluntary, Intelligent, and Knowing

Whether the plea was voluntary, intelligent, and knowing is the most significant of the five factors. *Richardson*, 225 F.3d at 51 (citing *United States v. Cotal-Crespo*, 47 F.3d 1, 3 (1st Cir. 1995)). To make this assessment, courts first review the Rule 11 hearing to determine whether the "court adequately observed the formalities imposed by Rule 11, which are intended to assure that the defendant understands the charge and the consequences of the plea." *Padilla-Galarza*, 351 F.3d at 597.

Rule 11(b) sets forth the district court's obligations in advising and questioning the defendant. Fed. R. Civ. P. 11(b)(1). Here, Ms. Forest "does not contest the first factor under *Padilla-Galarza*. She concedes that her March 17, 2009 'plea was voluntary, intelligent, and knowing.'" *Def.'s Mot.* at 4. Strict compliance with Rule 11 is "quite often dispositive in determining whether a defendant has knowingly and voluntarily entered a guilty plea." *United States v. Austin*, 948 F.2d 783, 787 (1st Cir. 1991). Based on Ms. Forest's concession and this Court's independent review of the Rule 11 colloquy, the Court finds that the formalities of Rule

11 were fully complied with at the March 17, 2009 hearing. The Court concludes that there was an absence of coercion, that Ms. Forest understood the charges, and that she had knowledge of the consequences of the guilty plea. *See United States v. Sahlin*, 399 F.3d 27, 32-33 (1st Cir. 2005); *Cotal-Crespo*, 47 F.3d at 4-8; *United States v. Santiago*, 229 F.3d 313, 317 (1st Cir. 2000); *United States v. Gose*, 260 F. Supp. 2d 209, 211 (D. Me. 2003). This factor strongly militates against allowing Ms. Forest to withdraw her guilty plea.

### C.     The Force of Defendant's Reason for the Change of Plea

A defendant may not renounce a guilty plea "without advancing a plausible reason for so doing." *United States v. Doyle*, 981 F.2d 591, 594 (1st Cir. 1992). Plausibility, however, must "rest on more than the defendant's second thoughts about some fact or point of law, or about the wisdom of his earlier decision." *United States v. Parrilla-Tirado*, 22 F.3d 368, 371 (1st Cir. 1994) (citations omitted).

Ms. Forest has not moved to withdraw both her guilty pleas. The fact that Ms. Forest concedes she is guilty of the theft of public money charge and is not seeking to withdraw her guilty plea on Count Seven enhances the motion since she has not experienced a wholesale epiphany of total innocence but rather a selective, if belated, conclusion that she is actually innocent of one crime.

Ms. Forest's explanation for why she pleaded guilty to a crime she did not commit remains foggy. She explained that her guilty plea was motivated by tragic family circumstances. One of her daughters was diagnosed with cancer around February 2009 and ten days later, one of her sons suffered a stroke. She testified that she concluded that her children might need her. In particular, she testified that her daughter Sherry was single and Ms. Forest thought Sherry would need help with her children. Ms. Forest concluded she "needed to take the quickest way out"

and plead guilty. *Tr. of Withdrawal of Guilty Plea Proceedings* 7:24-25 (Docket # 117). She also explained that she "knew that if I came to trial and I did not win, that I faced a longer sentence" and she pleaded guilty to shorten her sentence. *Id.* 8:19-20.

Ms. Forest's concern about delay and its relationship to her decision to plead guilty is difficult to understand. When Ms. Forest pleaded guilty on March 17, 2009, the case had been set for the March 2009 term of court, and if she had been anxious to go to trial, the Court would have readily accommodated her.

Further, it is difficult to understand how pleading guilty to a crime with a two-year mandatory consecutive sentence would free her to assist her children. If she had gone to trial in March 2009 on Count Ten and been found innocent, she would have only faced six to twelve months incarceration on the theft of public money charge, as indicated in the Presentence Report.[6] Instead, she pleaded guilty to the second charge of aggravated identity theft, which carries a mandatory two-year consecutive sentence. It is a mystery how pleading guilty to that charge was "the quickest way out."

The desire to plead guilty to avoid a longer sentence commonly rings true in federal criminal cases, since accepting responsibility typically reduces sentences under the guidelines. But here, because aggravated identity theft mandates a two-year consecutive period of incarceration, Ms. Forest is wrong about the sentencing range effect of pleading not guilty to

---

[6] Although not explored by the parties, from reviewing the charges in Counts I through VI, mail fraud, Count VIII, false statements, and Count IX, access device fraud, it may well be that a jury verdict of not guilty on the aggravated identity theft charge would have resulted in not guilty verdicts on these other counts. The reason is that the mail fraud charges and the access device fraud charge seem to be intertwined with Ms. Forest's application for and use of credit cards in Mr. Bouchard's name. It is less clear whether the same is true of her application for a post office box in Mr. Bouchard's name, since a jury could find her application was related to the theft of public money charge, which she still acknowledges she committed. However, if the jury determined that she applied for credit cards with Mr. Bouchard's permission, the jury could well have determined that she was also applying for the post office box with his permission. Without performing the guideline calculations, the Court suspects that even if she had been convicted of violating 18 U.S.C. § 1001, this additional conviction would not have significantly affected the guideline sentence range when added to a violation of 18 U.S.C. § 641.

aggravated identity theft.  The two-year term must be imposed regardless of whether she pleaded

guilty or was convicted at trial.  Thus, if she pleaded guilty to theft of public money and not

guilty to aggravated identity theft but was later found guilty of the latter, it is likely she would

have been accorded acceptance on the theft of public money and her prison term on the

aggravated identity theft would have been the same.[7]  Whether she knew about the interplay

between the guideline calculations and the mandatory two-year consecutive period of

incarceration is not a matter of record.[8]

      The second reason Ms. Forest proffered for pleading guilty to the aggravated identity

theft charges is that she assessed her chances of successfully defending the aggravated identity

theft charge as remote.  She claims that the alleged victim, Wallace Bouchard, had "pre-empted

her defense by lying to federal investigators, claiming ignorance, playing the victim, and blaming

Ms. Forest."  *Def.'s Mot.* at 5.  She says that the police interviewed Mr. Bouchard before

interviewing her, making her "version seem[] overly defensive instead of factual."  *Id.*  Further,

she points out that as she could not deny the theft of public money charge, the likelihood of

conviction for aggravated identity theft increased because the crimes are similar and her

accusations against Mr. Bouchard were uncorroborated.  *Id.* at 4-5.

      To understand the significance of this point, it is necessary to separate her application for

a post office box in Mr. Bouchard's and her joint names and her applications for credit cards in

his name.  Regarding the post office box, Ms. Forest explained that she applied for a post office

box in her and Mr. Bouchard's names on March 12, 2005 while she and Mr. Bouchard were

---

[7] It is theoretically possible, but highly unlikely, that the Court would deny acceptance for the theft of public money count because she went to trial on the aggravated identity theft charge.

[8] The plea agreement in this case set forth the statutory sentences, including the two-year consecutive term for violation of Count Ten.  *Plea Agreement* at 2.  The transcript of the Rule 11 proceeding reflects that the Court expressly explained to Ms. Forest that at sentencing, it would calculate the guideline sentence under Count Seven, decide whatever sentence to impose on Count Seven, and then impose an additional period of incarceration of two years on Count Ten.  *Tr. of Rule 11 Proceedings* 24:22-25:3 (Docket # 97).  Ms. Forest confirmed that she understood.  *Id.* at 25:4.

living together.  *Gov't's* Ex. 1.  She said that her daughter from southern Maine had sent her some photographs but they had not arrived.  She suspected someone was stealing mail from Wallace Bouchard's mailbox and resolved to obtain her mail at the post office.  She said she put his name on the post office box because she has numerous medical problems and if she were unable to get to the post office, she wanted Mr. Bouchard to be able to pick up her mail for her.

She went on to say that she asked Mr. Bouchard to come with her to the post office the day she opened the post office box, but he declined, saying that he had plans to go to Presque Isle that day and he authorized her to sign his name on the application.  She testified that she was given two keys and gave one to Mr. Bouchard.  Ms. Forest's version of the post office box application is uncorroborated.

By contrast, Ms. Forest's version of Mr. Bouchard's acquiescence to her applying for credit cards in his name is apparently corroborated.  At the May 28, 2010 evidentiary hearing, she testified that Mr. Bouchard received numerous invitations to apply for credit cards, and one day, while her friend Janet Charette was sitting in the kitchen at Mr. Bouchard's home, he came into the kitchen.  Ms. Forest said that she asked him whether she could fill out one of the credit card applications that had come to him in the mail.  She said that he replied, "[W]hatever my sweetie wants."  *Tr. of Withdrawal of Guilty Plea Proceedings* 18:15.  She testified that she asked him, "[H]ow many can I have?" and he replied, "[A]s many as you want as long as you pay the bill."  *Id.* 18:15-17.

Once Mr. Myers and Mr. Kutz confirmed that Mr. Bouchard had said that he was aware of the joint post office box, she concluded that the combined testimony of Ms. Charette, Mr. Myers, and Mr. Kutz was sufficient to undercut Mr. Bouchard's incriminating testimony and that a jury could believe the truth of her claim of his acquiescence.

In its response to the motion, the Government called Wallace Bouchard to rebut Ms. Forest's claims of his knowledge and consent. Mr. Bouchard unequivocally denied that he ever agreed to let Ms. Forest obtain a post office box in his name or that he ever gave her permission to apply for and use credit cards in his name. To the contrary, he testified that Ms. Forest and he were not getting along and that he had repeatedly asked her to move out. Mr. Bouchard also denied the alleged conversation at Delbart Daigle's garage. He agreed that he may have said that he was upset that the Fort Kent Post Office had allowed Ms. Forest to obtain a joint post office box with his name on it but without his permission. But he denied that he ever told anyone that she had opened the box with his permission.

The rest of the evidence at the hearings presaged a trial on the merits. On June 10, 2010, the Government cross-examined Ms. Forest and called as witnesses Mr. Myers, Mr. Kutz, Susan Boucher (Wallace Bouchard's daughter), and United States Postal Inspector Michael Desrosiers. Ms. Forest called Bertram Magnus, her private investigator, who testified about the interviews he conducted with Mr. Myers and Mr. Kutz. In particular, Mr. Myers and Mr. Kutz disputed Ms. Forest's contention that while at Delbart Daigle's garage, Mr. Bouchard had dismissively joked about the fact that he knew all along that Ms. Forest had taken out a post office box in both their names. Mr. Myers claimed that Mr. Magnus' recollection of his statements to the contrary was in error; Mr. Kutz acknowledged that he had told Mr. Magnus about Mr. Bouchard's alleged comments, but he freely admitted that he had lied in an effort to assist Ms. Forest. No doubt, the Government has raised significant credibility issues in this case and Ms. Forest will have much to answer for if she takes the stand at trial.

Nevertheless, from the Court's perspective, to evaluate the force of Ms. Forest's reason for her change of guilty plea does not require credibility determinations about whether Ms.

Forest is in fact guilty of the offense to which she pleaded guilty. This is a matter for a factfinder. Instead, in assessing this factor, the First Circuit has directed the inquiry to whether the defendant has raised a "plausible reason for so doing." *Doyle*, 981 F.2d at 594. This is not a particularly rigorous standard. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (requiring that a plausible complaint include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (stating that the plaintiff must have "nudged their claims across the line from conceivable to plausible"); *Sec. and Exch. Comm'n v. Tambone*, 597 F.3d 436 (1st Cir. 2010) (describing the plausibility standard as whether the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture").

The Government strenuously contends that Ms. Forest has failed to provide even a plausible reason for withdrawing her guilty plea. The Government points out that the March 17, 2009 Rule 11 hearing was not the first time Ms. Forest admitted committing the offense of aggravated identity theft. On July 5, 2007, Ms. Forest was interviewed at the Fort Kent Police Department by Officer Richard Martin and Inspector Desrosiers, and she signed and swore to a typewritten statement that contained an admission that Mr. Bouchard was unaware that she had applied for credit cards in his name. Gov't's *Mot.* Attach. 5. Again on May 20, 2008, Ms. Forest met with Assistance United States Attorney (AUSA) James Moore and Inspector Desrosiers and signed another statement, admitting that she did not have Mr. Bouchard's permission to apply for a joint post office box or for credit cards in his name. *Id.* Attach. 6.

To explain why she had signed and sworn to two statements contrary to her hearing testimony, Ms. Forest accused Officer Martin, Inspector Desrosiers, and AUSA Moore of

violating her constitutional rights and suborning perjury. She said that on both occasions, July 5, 2007 and May 20, 2008, she repeatedly asked for a lawyer but was told on both occasions that she did not have the right to counsel. She said that on July 5, Officer Martin told her that although she did not have to answer any questions, if she did not, he would "come and get me with handcuffs," a statement she perceived "as a threat." *Tr. of Withdrawal of Guilty Plea Proceedings* 32:13-15. She testified that she "immediately asked for a lawyer" and that she "was denied that." *Id.* 32:15. She was afraid she was going to be "thrown in jail." *Id.* 32:16-17. She testified that the law enforcement officers told her that her lawyer "would come later" and she would be appointed one when she came to Bangor. *Id.* 35:23-25.

She testified that when she arrived in Bangor on May 20, 2008, she asked Mr. Moore and Inspector Desrosiers where her lawyer was, and she was told that "I would not have an attorney until after this questioning was done." *Id.* 37:3-4. She again thought they were "going to throw me in jail in Bangor" and she signed the document because on that day, she "would have signed [her] life away literally." *Id.* 37:6-8.

She claimed that the July 5 and May 20 sworn statements were not only false but also that she had told Officer Martin, Inspector Desrosiers, and AUSA Moore that they were false. She said that she "repeatedly" told Officer Martin and Inspector Desrosiers on July 5 about Mr. Bouchard being present in the kitchen with Jean Charette and that she had had Mr. Bouchard's permission to apply for credit cards. *Id.* 32:25-33:4. She claimed she had also told them that Mr. Bouchard had given her permission to apply for the post office box in his name. *Id.* 33:4-7. She made the same allegations about the May 20 meeting with Inspector Desrosiers and AUSA Moore. She said that she "repeatedly told Mr. Moore and Mr. Desrosiers that I had - - Wallace had notice, that I had discussed this issue with him. I had his permission." *Id.* 36:20-22.

According to Ms. Forest, despite the fact she had told the truth to Officer Martin, Inspector Desrosiers, and Mr. Moore, they had prepared statements containing falsehoods and she had signed and sworn to them under pressure and without being accorded her right to counsel.

Ms. Forest's allegations against these government officials are profoundly troubling. At the June 10, 2010 hearing, Inspector Desrosiers flatly denied her allegations, and as he was present at all times when both Officer Martin and AUSA Moore were present with Ms. Forest, the Court assumes that Officer Martin and AUSA Moore would similarly deny these most serious allegations. However, the Court does not reach the question as to whether Ms. Forest is telling the truth about why she signed and swore to two false statements, whether she in fact demanded and was denied the right to counsel, and whether she in fact told them the truth before signing what she knew to be false statements. The relationship between these grave allegations of government misconduct and the force of her reason to change her plea is highly attenuated. Her allegations and the officers' denials go straight to credibility, and at this stage, the Court is charged with deciding not whether Ms. Forest's protestations of innocence will be believed when placed before a jury but whether the force of her reason for changing her plea is plausible.

Despite the seriousness of these and other conflicts, the conflicts remain tangential to the main sub-issue—whether Ms. Forest's reason for wishing to change her plea carries sufficient force.[9] Her basic point here is that her side of the story seemed too weak to press until it was corroborated and once it was, she wished to have a trial. Even though some of her supposed collaborators recanted, it remains plausible that Ms. Forest has now summoned the courage to seek a trial, and it appears that her version of the events is confirmed—at least in part—by Janet Charette, who did not testify at the hearing and who apparently will testify that in her presence,

---

[9] To be clear, the Court has made no finding whatsoever that any of these government officials did anything wrong. It has not reached the issue because it is not required to do so.

Mr. Bouchard authorized Ms. Forest to complete a credit card application that had been sent to him. On this point alone, the Court concludes that, however successful it may ultimately be, she has presented "a plausible reason" for renouncing her earlier guilty plea. *Doyle*, 981 F.2d at 594.

**D.     The Timing of the Motion**

The Court accepted Ms. Forest's guilty plea on March 17, 2009 and she filed the motion to withdraw on May 4, 2010, over thirteen months later. The First Circuit has noted that a "long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses." *Doyle*, 981 F.2d at 595; *see also United States v. Isom*, 85 F.3d 831, 838-39 (1st Cir. 1996). It has also noted that the "longer a defendant waits before moving to withdraw his plea, the more potency his motion must have in order to gain favorable consideration." *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 23 (1st Cir. 1994) (quoting *Parrilla-Tirado*, 22 F.3d at 373 (1st Cir. 1994)).

The First Circuit has explained, however, that the "relevant temporal gap" is the time between the defendant's "discovery of new information and the filing of his motion," not the time between the Rule 11 and the motion to withdraw. *Gonzalez*, 202 F.3d 20, 24 (1st Cir. 2000), *abrogated on different grounds by Padilla v. Kentucky*, 130 S. Ct. 1473 (2010). The First Circuit has rejected plea withdrawal motions in which the relevant gap was eight months, *Id.*; six months, *Doyle*, 981 F.2d at 595 and *Parrilla-Tirado*, 22 F.3d at 373; five months, *United States v. Torres-Rosa*, 209 F.3d 4, 9 (1st Cir. 2000); four months, *United States v. Gonzalez-Vazquez*, 34 F.3d at 23; fourteen weeks, *United States v. Marrero-Rivera*, 124 F.3d 342, 353 (1st Cir. 1997); two months, *Isom*, 85 F.3d at 839; eight weeks, *United States v. Pellerito*, 878 F.2d 1535, 1541 (1st Cir. 1989) and *United States v. Crosby*, 714 F.2d 185, 192 (1st Cir. 1983); three weeks,

*United States v. Keefe*, 621 F.2d 17, 18 (1st Cir. 1980); and even thirteen days, *United States v. Ramos*, 810 F.2d 308, 313 (1st Cir. 1987).

Ms. Forest urges the Court to calculate the timing of her motion from April 26, 2010, the date she became aware of Mr. Kutz's statement. Even though she was aware of Mr. Myers' statement on October 7, 2009 or perhaps even earlier, she explains that she did not believe that his "statement alone would form a sufficient basis for withdrawing her plea and prevailing on the above counts at trial." *Def.'s Mot.* at 3. When she learned that Mr. Kutz corroborated Mr. Myers' recollection, she decided there was sufficient cumulative independent evidence to justify her motion. She filed the motion for leave to withdraw her guilty plea on May 4, 2010, a week after Mr. Kutz made the statement to her investigator.

In the unusual circumstances of this case, the Court credits Ms. Forest's decision not to proceed with the motion based on the new information about Mr. Myers' corroboration alone. Twice before pleading guilty, Ms. Forest had signed sworn declarations confirming that Mr. Bouchard had not authorized her to obtain a post office box in his name or to apply for credit cards in his name. To file a motion to withdraw because one person overheard Mr. Bouchard discussing his asserted knowledge would have been difficult; however, once Mr. Kutz confirmed similar statements by Mr. Bouchard, the chance of success on the motion to withdraw increased and justified her motion. The timing weighs somewhat in favor of the motion.

### E. Whether the Defendant Asserts Her Actual Innocence

The First Circuit has said that courts should "look more hospitably on a motion to withdraw a guilty plea when the motion is coupled with an assertion of innocence." *Doyle*, 981 F.2d at 596. On the other hand, if the Defendant does not proclaim her actual innocence, "this

factor cuts sharply against allowing appellant's motion to withdraw [her] guilty plea." *Parrilla-Tirado*, 22 F.3d at 373; *see Doyle*, 981 F.2d at 596.

Ms. Forest's claim that Wallace Bouchard, the alleged victim, actually knew about her use of his identity to obtain credit cards and to apply for the post office box could be an effective defense to the charge. Aggravated identity theft is a crime within a crime. The Government must first prove that the Defendant committed one of the enumerated felonies in 18 U.S.C. § 1028A(c). In this case, the indictment charged that the enumerated felony was committing fraud in connection with an access device, a violation of 18 U.S.C. § 1029(a)(2). To prove aggravated identity theft against Ms. Forest, the Government must establish the following elements: 1) that the defendant committed access fraud, a violation of 18 U.S.C. § 1029(a)(2); 2) that during and in relation to that felony, she knowingly transferred a means of identification without lawful authority; 3) that the means of identification actually belonged to another person; and, 4) that she knew that the means of identification belonged to another person. Judge Hornby's 2010 Revisions to Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.1028A (2010).

The elements of the crime of access device fraud include: 1) that the defendant used an access device; 2) that the defendant used it without authorization and thereby obtained something of value aggregating at least $1,000 during any one year period; 3) that the defendant acted knowingly, willfully and with the intent to defraud; and, 4) that the defendant's conduct affected interstate or foreign commerce. *Id.* at § 4.18.1029. The term "access device" includes credit cards. *United States v. Lee*, 317 F.3d 26, 36 (1st Cir. 2003). In the Government's Proposal of Facts and Version of the Offense, Ms. Forest admitted these elements: 1) she used credit cards, 2) she used the credit cards in the name of Wallace Bouchard without his approval and without

lawful authority, 3) she obtained something of value in excess of $1,000, and 4) she admitted facts sufficient to infer that the transactions affected interstate commerce. *Pros. Version* at 4.

The Government contends that Mr. Bouchard's knowledge of her credit card applications in his name is irrelevant to Ms. Forest's guilt. *Gov't's Supp. Mem.* at 3. The Government says that the phrase "without lawful authority" signifies a congressional "intent to prohibit more than . . . use of identification that was obtained by theft." *Id.* Thus, the Government argues that the Court must analyze whether Mr. Bouchard's permission makes Ms. Forest's use of his identity lawful. *Id.* at 2.[10] The Government concludes that because "the integrity of the use of social security numbers as a means of identification and the reliance in this case of the credit card companies on the use of such identifiers dictates an applicant must use his or her own means of identification in order to obtain credit cards," "the defendant was engaging in fraud by concealing her own poor credit." *Id.* at 4. The Court disagrees.

The victim's knowledge and consent constitute a defense to the underlying charge of access device fraud and the indicted charge of aggravated identity theft since both crimes require that the defendant act with the intent to defraud, 18 U.S.C. § 1029(a), or without lawful authority. 18 U.S.C. § 1028A(a). The Government correctly points out that a defendant can permissively use another person's identification and still not have "lawful authority" to do so. *United States v. Hines*, 472 F.3d 1038, 1039-40 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 235 (2007) (stating that even if the defendant had been given permission to use the other person's identification, the defendant acted without lawful authority when he used the identification to defraud police).

---

[10] The Government also argues that even if Mr. Bouchard knew that Ms. Forest obtained credit cards in his name, "[t]he record is completely devoid of any evidence that Wallace Bouchard gave Sharon Forest permission to use his social security number." *Gov't's Supp. Mem.* at 4. However, Ms. Forest stated that Mr. Bouchard specifically approved her opening credit cards in his name. *Tr. of Withdrawal of Guilty Plea Proceedings* 18:10-17. Although Mr. Bouchard might not have known that opening credit cards required use of his social security number, Ms. Forest could reasonably have assumed that he did. The scope and extent of Mr. Bouchard's permission is a question of fact for the jury.

Here, however, the Court is not clear that applying for and using a credit card in someone else's name with their express permission would necessarily constitute a violation of 18 U.S.C. § 1028A. At the very least, if Mr. Bouchard gave Ms. Forest permission, this fact would call into question whether Ms. Forest acted "knowingly, willfully and with the intent to defraud." Judge Hornby's 2010 Revisions to Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.1028A. The "unseemly prospect of imposing a lengthy federal sentence on a [woman] who, despite having admitted to the crime, now proclaims [her] innocence weighs in favor of granting the motion." *United States v. Newbert*, 471 F. Supp. 2d 182, 198 (D. Me. 2007).

**F.     Whether a Plea Agreement Was Entered Into and Breached**

Ms. Forest does not dispute she entered into a plea agreement and under *Gonzalez*, the signed agreement "casts further doubt on [her] claims." *Gonzalez*, 202 F.3d at 24.[11] In *Ramirez-Benitez*, the First Circuit reviewed the contents of the plea agreement in tandem with the Court's inquiry at the Rule 11. *United States v. Ramirez-Benitez*, 292 F.3d 22, 28 (1st Cir. 2002). Here, the plea agreement contains the signature of the Government's attorney, Ms. Forest, and her attorney. *Plea Agreement* at 5-6. During the Rule 11, Ms. Forest confirmed the Defendant's signature was hers, that she had signed the agreement voluntarily, that she had read the agreement before she signed it, that she understood all its contents, and that by signing it she intended to agree to all its terms and conditions. *Tr. of Rule 11 Proceedings* at 31-32.

The plea agreement set forth in detail the charges to which she was pleading guilty, the terms of imprisonment, including the two-year consecutive sentence for aggravated identity theft, and other potential penalties. *Plea Agreement* at 2-3. It also referred to withdrawal of her

---

[11] The plea agreement in this case was not a package plea and does not raise the same voluntariness concerns the First Circuit expressed in *United States v. Mescual-Cruz*, 387 F.3d 1, 3 (1st Cir. 2004).

guilty plea. *Id.* at 3-5. It specified that Ms. Forest would not be allowed to withdraw her plea of guilty if the Court at sentencing rejected the recommendations of the Government and the defense. The plea agreement provided a series of consequences in the event she breached the terms of the plea agreement. *Id.* at 4-5. It also stated that if she is allowed to withdraw her guilty plea, and the court determines she has not breached the agreement, any proffer agreement would remain in effect. *Id.* at 5.[12] The Court concludes the plea agreement in this case "casts further doubt" on the merits of her motion. *Gonzalez*, 202 F.3d at 24.

### G.  Prejudice to the Government

Before allowing a defendant to withdraw her guilty plea, the court must consider "the potential prejudice to the government." *Richardson*, 225 F.3d at 51. The relevant period is from March 2009, when the case would have gone to trial, to today.[13] The Court anticipates that the case will be tried either in July or August of this year. Although there is always a chance—as the Government asserts—that memories would have been better in March 2009 than the summer of 2010, there has been no direct showing to that effect, and the Government witnesses who testified, Mr. Bouchard, Susan Boucher, and Officer Desrosiers, did not appear to be suffering any lack of specific memory. There is "no suggestion that critical witnesses are unavailable, that evidence has been lost, or that any similar prejudice would obtain. Further, the evidence at the motion hearing suggests otherwise." *Newbert*, 471 F. Supp. 2d at 199.

---

[12] Ms. Forest makes no claim the Government breached the plea agreement. *Cf. United States v. Tilley*, 964 F.2d 66, 69-71 (1st Cir. 1992).

[13] The Government says that it is prejudiced because it "should not be required to mount a trial almost five years after the aggravated identity theft to which the defendant has already pled guilty." *Gov't's Obj.* at 8. But the grand jury did not indict Ms. Forest until August 13, 2008; absent unusual factors not present here, the Government cannot claim prejudice during the period she was not under indictment. The grand jury issued a superseding indictment on November 12, 2008 for six counts to which she ended up not pleading guilty. *Superseding Indictment*. No doubt, six new counts further complicated the defense and caused additional delay. The period from August 13, 2008 to March 2009 was not an unusual delay from indictment to guilty plea, and during that interval, on December 23, 2008, the Government itself moved to continue the case from the trial list for the month of February, 2009. *Unopposed Mot. to Continue Trial* (Docket # 49). The Court has, however, considered the period from March 2009 to today because all of that delay, which is unusual, was caused solely by the Defendant.

The Court understands that the Government is rightfully chagrined at the prospect of having to prove at trial that the Defendant committed a crime she has repeatedly admitted she committed. The Government has clearly telegraphed to the Court its considerable annoyance at this turn of events. But the Government's frustration, however legitimate, is not the same as prejudice.

## III.    CONCLUSION

Ms. Forest's motion to withdraw her guilty plea to the crime of aggravated identity theft presents the Court with a difficult decision. There are compelling judicial policies favoring the finality of court actions, discouraging litigants from making misrepresentations to the courts, and holding them to their agreements. On March 17, 2009, Ms. Forest stood in open court, admitted her guilt, affirmed in detail what she had done, acknowledged the potential punishment, and after a painstakingly thorough inquiry, pleaded guilty as charged.[14] Over a year later, she announces

---

[14] As part of the Rule 11 colloquy, the Court directed the following questions to Ms. Forest and she gave the following answers:

> Q. Ms. Forest, have you pleaded guilty to the charges contained in Counts 7 and 10 of the superseding indictment because you are actually guilty of those crimes and for no other reason?
> A. Yes, sir.

*Tr. of Rule 11 Proceedings* 21:20-24.

> Q. As a part of your pleading guilty, I must find there is a factual basis for your guilty plea, and to assure myself there is such a factual basis, I'll be asking you questions about the conduct that gave rise to these charges, and you must answer my questions truthfully. Do you understand?
> A. Yes, sir.

*Id.* 27:25-28:6.

> Q. Ms. Forest, have you had an opportunity to review the government's proposal of facts and version of the offenses which is dated February 25, 2009?
> A. Yes, sir.
> Q. I'm going to ask you a very important question, Ms. Forest, and obviously, I need a truthful answer. Do you disagree in any way with what the government proposes in terms of what happened here?
> A. No, sir.
> Q. Is the information set forth in the government's proposal of facts and version of the offenses true to your own personal knowledge?
> A. Yes, sir.

she has been actually innocent all along and seeks trial. Judicial policies discouraging in-court misrepresentations and encouraging parties to live up to court-sanctioned bargains are clearly applicable here. But as Ms. Forest has not yet been sentenced, the judicial policies favoring finality are not as clearly implicated. To allow a defendant to withdraw a guilty plea before sentence, the Court must only be satisfied that there is a "fair and just reason" for doing so. Fed. R. Crim. P. 11(d)(2)(B); *cf.* Fed. R. Crim. P. 11(e) (providing that after the court imposes a sentence, "the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack").

Even under the "fair and just reason" standard, this case is very close. Nevertheless, Ms. Forest asserted under oath that Mr. Bouchard gave her permission to obtain a post office box in their joint names and that he gave her express permission in the presence of a third witness to apply for and use credit cards in his name. At stake is an additional federal conviction for a serious federal felony and two years of incarceration. Because a woman's freedom hangs in the balance, the Court concludes the better course is to allow a jury to determine whether she is guilty—as she once admitted she was—or not guilty—as she now insists she is. *Newbert*, 471 F. Supp. 2d at 199.

The Court GRANTS the Defendant's Motion to Withdraw Guilty Plea (Docket # 85).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 11th day of June, 2010

---

*Id.* 29:13-25.

The Court cannot reconcile Ms. Forest's responses at the March 17, 2009 Rule 11 hearing with her current position on the pending motion to withdraw guilty plea.