UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-08-155-B-W |
| | ) | |
| SHARON L. FOREST | ) | |

**ORDER ON DEFENDANT'S MOTION *IN LIMINE*
REGARDING HOUSING FRAUD EVIDENCE**

Guided by *United States v. Catalan-Roman*,[1] the Court dismisses without prejudice Sharon Forest's motion *in limine* seeking a pre-trial ruling regarding potential impeachment testimony she wishes to admit against the alleged victim of the pending charge of aggravated identity theft.

## I. STATEMENT OF FACTS

### A. The Procedural Backdrop

On August 13, 2008 in a four count indictment, a federal grand jury indicted Sharon L. Forest for theft of public money, a violation of 18 U.S.C. § 641; false statements, a violation of 18 U.S.C. § 1001; fraud in connection with access devices, a violation of 18 U.S.C. § 1029(a)(2); and aggravated identity theft, a violation of 18 U.S.C. § 1028A. *Indictment* (Docket # 1). On November 12, 2008, a federal grand jury issued a superseding indictment of Sharon Forest that contained ten counts, adding six counts of mail fraud, violations of 18 U.S.C. § 1341, to the prior charges. *Superseding Indictment* (Docket # 32). On March 17, 2009, Ms. Forest entered a conditional plea of guilty to Counts Seven and Ten, theft of public money and

---

[1] 585 F.3d 453 (1st Cir. 2009).

1

aggravated identity theft. *Minute Entry* (Docket # 66). On May 4, 2010, Ms. Forest moved to withdraw her guilty plea to Count Ten only, the aggravated identity theft charge. *Def.'s Mot. to Withdraw Guilty Plea* (Docket # 85) (*Def.'s Mot. to Withdraw*). On June 11, 2010, after an extensive evidentiary hearing and over the Government's strenuous objection, the Court granted Ms. Forest's motion. *Order Granting Def.'s Mot. to Withdraw Guilty Plea* (Docket # 128). Ms. Forest did not move to withdraw her guilty plea to Count Seven, theft of public money, and she remains convicted of that crime. Trial on Count Ten and all remaining charges is scheduled to begin September 7, 2010.

On June 23, 2010, Ms. Forest moved *in limine* to permit evidence that Wallace Bouchard was complicit in Ms. Forest's housing assistance fraud, which underlies the charge of theft of public money. *Def.'s Mot.* in Limine *Regarding Housing Fraud Evid.* (Docket # 138) (*Def.'s Mot.*). The Government objected. *Gov't's Resp. to Def.'s Mot.* in Limine *to Allow Extrinsic Test. Regarding the Def.'s Collection of Money on Wallace Bouchard's House* (Docket # 142) (*Gov't's Resp.*). On July 26, 2010, Ms. Forest waived her right to file a reply. *Def.'s Reply to Gov't's Resp. to Def.'s Mot.* in Limine *Regarding Housing Fraud Evid.* (Docket # 143).

**B.    The Pending Aggravated Identity Theft Charge**

To place Ms. Forest's motion in context, the Court begins with the charge now pending in Count Ten, aggravated identity theft:

> Beginning on about September 13, 2005 and continuing to March 14, 2007, in the District of Maine, the defendant, Sharon L. Forest[,] knowingly used, without lawful authority, a means of identification of another person, namely, Social Security Number xxx-xx-7070, during

2

and in relation to fraud in connection with an access device, in violation of Title 18, United States Code, Section 1029(a)(2).

*Superseding Indictment* at 4.[2] The Prosecution Version, which she admitted during the Rule 11 guilty plea proceeding, states in part:

> Fort Kent Officer Richard Martin would testify in the July 5, 2007 interview that defendant Sharon Forest admitted she had applied for, received and used for her own personal gain from September, 2005 through March, 2007 five credit cards from Bank of America, HSBC, Washington Mutual and Chase Banks in the name of Wallace Bouchard. Defendant Forest confessed to Officer Martin that she applied for the credit cards in Mr. Bouchard's name because she believed applications for the cards in her own name would not have received approval. The defendant further acknowledged to the Fort Kent police officer that she made charges on the credit card accounts with knowledge that she did not have the ability to pay for the debt that she was incurring. A sworn statement signed by the defendant containing her admissions regarding her knowing and fraudulent intent to use the credit cards would be introduced into evidence through the testimony of Officer Martin.
>
> Postal Inspector Michael Desrosiers would testify that Sharon Forest admitted during the May 20, 2008 interview of the defendant that she knowingly used the identity of Wallace Bouchard, as well as Mr. Bouchard's social security number and date of birth, without his approval and without lawful authority with the intent to unlawfully apply for and receive the six following credit cards: two Chase credit cards, two HSBC credit cards, a Bank of America credit card and a Washington Mutual credit card. Inspector Desrosiers would add that the defendant confessed she had knowingly planned in advance and obtained money from the six credit card companies under false pretenses and by making false statements and false representations when she applied for the six credit cards. Defendant Forest further conceded that she had used the name of Wallace Bouchard when she completed applications for the 6 credit cards when in truth and fact as she very well knew that she was the real applicant and recipient of the credit cards. In addition to the above admissions, Forest confessed in a

---

[2] As part of her guilty plea, the Government agreed to dismiss after sentencing Counts I through VI, the mail fraud charges; Count VIII, false statements; and Count IX, access device fraud. *Agreement to Plead Guilty* (Docket # 64). With the granting of her motion to withdraw her guilty plea on Count X, the Government is not bound by the agreement to dismiss these counts and it will presumably proceed to trial on all pending charges. For purposes of placing the Defendant's motion *in limine* in context, however, it is enough to describe the aggravated identity theft and theft of public money charges.

written declaration that Wallace Bouchard was not aware that she was using credit cards received under his name.

Applications admitted into evidence would show the defendant used Social Security Number xxxx-xx-7070, during and in relation to fraud in connection with the six credit cards. Statements from the six credit card companies would be admitted into evidence and would establish that the defendant from March 14, 2006 through March 14, 2007 obtained items with use of the credit cards which had value aggregating in excess of $1,000 during that time period. Defendant's intent to defraud would further be proven with use of evidence that she had filed an application with the U.S. Postal Service for Post Office Box in the name of Wallace Bouchard in order to conceal her applications for credit cards . . . when in truth and fact as very well known by the defendant, Mr. Bouchard was not an applicant for a Post Office Box.

*Gov't's Proposal of Facts and Version of Offenses* at 3-5 (Docket # 62) (*Pros. Version*).

### C. The Theft of Public Money Conviction

Ms. Forest admitted to the following facts underlying the charge of theft of public money:

Through the testimony of Susan O'Clair, an Aroostook County Action Program (ACAP) Housing Specialist, an application and annual household re-certification declarations for Section 8 Housing Subsidy Payments in the name of Wallace Bouchard as well as photocopies of 89 ACAP checks would be admitted into evidence, showing the defendant received $18,193 in Section 8 funds. Ms. O'Clair would explain th[r]ough her testimony three matters relating to applicants and participants in HUD Section 8 subsidized housing programs: (1) the requirement that the tenant-applicant provide full and complete disclosure of tenant income; (2) the requirement that the applicant-participant provide truthful information; and (3) the preclusion from tenant-participant benefits in connection with more than one unit at a time.

Officer Richard Martin of the Fort Kent, Maine Police Department would testify the defendant Sharon Forest admitted during a July 5, 2007 interview that she had completed documents in the name of Wallace Bouchard to receive rental assistance to which she knew she was not entitled to receive from ACAP. Defendant Forest further

4

confessed to Officer Richard Martin that she had received the ACAP money from 1999 through April of 2007 and had used approximately $12,000 of ACAP funds for her own personal benefit and gain. A written sworn statement signed by the defendant and setting forth her admissions regarding fraudulent receipt of ACAP funds would be introduced into evidence through the testimony of Officer Martin.

U.S. Postal Inspector Michael Desrosiers would testify he conducted an interview of the defendant on May 20, 2008 during which Ms. Forest admitted that in September of 1995, she had moved into the single family residence of Wallace Bouchard and continued to live with him through April, 2007. Inspector Desrosiers would further testify the defendant admitted she had knowingly failed to identify Mr. Bouchard as a person with whom she was residing in a single family residence and likewise failed to disclose to ACAP the income of Mr. Bouchard in order to continue receiving Section 8 funds. Defendant Forest also confessed to the postal inspector that she was aware that if she had disclosed that she was living in the same single family residence with Wallace Bouchard or if she had reported the income of Mr. Bouchard to ACAP that financial housing assistance would not have been provided by ACAP. Ms. Forest further admitted, as a person receiving financial assistance from the housing program, she was aware from the time she entered the program that she was required to inform ACAP of each person who was living in her household and the income of each person who was living in her household. The defendant also voluntarily acknowledged during the inspector's interview that she had from August 16, 1996 through April 30, 2007 wil[l]fully and knowingly used ACAP funds for her own use in an amount which was greater than $1,000.00 and was the property of a federal housing agency.

*Id.* at 2-3.

Ms. Forest also admitted what Wallace Bouchard would testify if called as a witness:

Wallace Bouchard would add that he was not aware of credit card applications as well as an ACAP application submitted in his name and that he did not provide signatures of his name in the application.

*Id.* at 3.

### D. The Motion to Withdraw

Ms. Forest's main allegation in the motion to withdraw her guilty plea was that regarding both the housing fraud and credit card and post office box charges, Wallace Bouchard and she were partners in crime, and he was aware of her false ACAP and credit card and post office box applications.[3] Whether Mr. Bouchard knew about the false ACAP charge did not affect her culpability for that crime; but whether he knew about the false credit card application and authorized her use of his credit and his name could be a defense to the credit card count. To prove aggravated identity fraud, the Government must establish that Ms. Forest "knowingly [transferred/possessed/used] a means of identification . . . *without lawful authority*." Judge Hornby's 2010 Revisions to Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.1028A (2010) (emphasis added).[4]

### E. The Motion *in Limine*

#### 1. Ms. Forest's Contentions

In her motion *in limine*, Ms. Forest anticipates that her theory of defense at trial will be consistent with the theory underlying her motion to withdraw: she did not commit any of the remaining crimes because Wallace Bouchard knew about and

---

[3] The immediate cause for Ms. Forest's motion to withdraw her guilty plea is her claim that two witnesses overheard Wallace Bouchard, the alleged victim of the identity theft, admit that he knew that Ms. Forest had taken out credit cards and opened a post office box in his name. *Def.'s Mot. to Withdraw* at 2-3. The credibility of these allegations, however, was severely undermined during the evidentiary hearing on the motion to withdraw when both men took the stand and effectively denied the truth of what Ms. Forest contended they had said. One man testified that he had lied about Mr. Bouchard's comments and the other man denied a private investigator's recollection about what he had said about Mr. Bouchard's comments.

[4] There are similar requirements for the false statement in applying for a post office box and access device fraud counts. Judge Hornby's 2010 Revisions to Pattern Criminal Jury Instructions for the District Courts of the First Circuit Court § 4.18.1001 (requiring a knowing and willfully made materially false statement), § 4.18.1029 (requiring use without authorization).

6

authorized her actions. *Def.'s Mot.* at 3. In an effort to demonstrate Mr. Bouchard's complicity, she seeks to introduce evidence on the theft of public money charge to which she has pleaded guilty that "Mr. Bouchard embarked on a scheme to simultaneously frame her on the Aggravated Identity Theft and escape liability for his role in the [theft of public money] fraud." *Id*. Ms. Forest says that Mr. Bouchard "lied to investigators about not knowing about the [theft of public money] fraud and the credit cards that underlie the Aggravated Identity Theft." *Id*. Ms. Forest "seeks to present evidence at trial that Mr. Bouchard knew about, was complicit in and benefitted from the [theft of public money] fraud as well as the credit cards." *Id.*

Specifically, Ms. Forest says that when Mr. Bouchard testified at the evidentiary hearing for the motion to withdraw her guilty plea, he stated that "around 2000, James Charette informed him that Ms. Forest was engaged in or attempting to engage in housing assistance fraud" and that "Ms. Forest had solicited his wife Janet Charette to sign his name to the [housing assistance fraud] documents." *Id.* at 4. During the evidentiary hearing on the motion to withdraw, Ms. Forest attempted to impeach Mr. Bouchard by offering Mr. Charette's denial that he had made these statements to Mr. Bouchard. *Id.* Although the Court allowed Ms. Forest's counsel to explore this issue at the hearing on the motion to withdraw, it warned defense counsel that this same evidence might not be admissible at trial. *Redacted Tr. of June 10, 2010 Hearing* 137:4-138:9 (Docket # 135). Ms. Forest's counsel believes evidence that Mr. Charette denied that Mr.

7

Bouchard told him in 2000 that Ms. Forest was engaged in housing assistance fraud and that she had asked Mr. Charette's wife to sign his name to fraudulent documents would be admissible because this impeachment evidence would not be on a collateral matter but would be "logically relevant to the merits of the case as well as the witness's credibility." *Def.'s Mot.* at 5 (quoting *United States v. Catalan-Roman*, 585 F.3d 453, 469 (1st Cir. 2009)).

### 2. The Government's Response

In its response, the Government posits three reasons Ms. Forest's proposed evidence is inadmissible: (1) it would not be relevant, (2) it is barred by law of the case, and (3) extrinsic evidence may not be used to impeach by contradiction. *Gov't's Resp.* at 2-7. Regarding the first point, the Government observes that Mr. Bouchard's testimony was actually that Mr. Charette told him around 1998 that Ms. Forest was "collecting some money" on his house. *Id.* at 1. The Government says that even if Mr. Charette were to testify that he did not tell Mr. Bouchard in 1998 that Ms. Forest was doing so, it would not be relevant to whether Ms. Forest committed the crimes with which she has been charged and therefore would be inadmissible under Rule 401. *Id.* at 2-3. The Government claims that the Court ruled on the admissibility of the evidence during the hearing on the motion to withdraw and this ruling should not be revisited. *Id.* at 4-5. Finally, the Government claims that because Ms. Forest has admitted committing the housing assistance fraud, whether Mr. Bouchard told James Charette in 1998 that he was

8

aware of the fraud is collateral to whether she committed any of the currently alleged crimes. *Id.* at 5-7.

## II. DISCUSSION

### A. *United States v. Catalan-Roman*

Last year, in *United States v. Catalan-Roman*, the First Circuit addressed in detail the question of impeachment by collateral evidence. 585 F.3d 453 (1st Cir. 2009). "Under the common law of evidence and the law of this circuit, impeachment by extrinsic evidence is normally restricted to impeachment on matters that are not collateral." *Id.* at 468 (citing *United States v. Cruz-Rodriguez*, 541 F.3d 19, 30 (1st Cir. 2008)). A matter is considered collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) (quoting 1 McCormick on Evidence § 45 (4th ed. 1992)). Although any demonstrated inconsistency in a witness's statement may impeach a witness's credibility, other concerns (such as wasting time and misleading the jury) become more important when the inconsistency at issue involves a statement relating to a matter that "is not relevant in the litigation to establish a fact of consequence." *Id.* (quoting 1 *McCormick on Evidence* § 45, 169 (4th ed. 1992)). On the other hand, when a statement that would be the subject of impeachment "is logically relevant to the merits of the case as well as the witness's credibility, it is worth the additional court time entailed in hearing extrinsic evidence." 1 *McCormick on Evidence* § 49 (6th ed. 2006). In *Catalan-Roman*, the

9

Court pointed out that the rule restricting impeachment to non-collateral matters "is analogous to Rule 403's relevancy balancing test, which calls for relevant evidence to be excluded when its 'probative value is substantially outweighed by . . . considerations of undue delay, [or] waste of time . . . .'" *Catalan-Roman*, 585 F.3d at 469 (alterations in original) (quoting Fed. R. Evid. 403). The First Circuit summarized the correct approach:

> Although any demonstrated inconsistency in a witness's statement may impeach a witness's credibility, other concerns (such as wasting time and misleading the jury) become more important when the inconsistency at issue involves a statement relating to a matter that "'is not relevant in the litigation to establish a fact of consequence.'" *Beauchamp*, 986 F.2d at 4 (quoting 1 *McCormick on Evidence* § 45, 169 (4th ed. 1992)). On the other hand, when a statement that would be the subject of impeachment "is logically relevant to the merits of the case as well as the witness's credibility, it is worth the additional court time entailed in hearing extrinsic evidence." 1 *McCormick on Evidence* § 49 (6th ed. 2006).

*Id.*

### B. The Factual Underpinning

During the May 28, 2010 evidentiary hearing, Mr. Bouchard was asked by defense counsel whether he recalled a conversation in which Janet Charette was present that had to do with credit cards and Mr. Bouchard replied "Not really, no, no." *Tr. of May 28, 2010 Hearing* 101:20-23 (Docket # 117). Defense counsel pressed and Mr. Bouchard replied:

> A. You want to talk about Janet Charette? Can I say something about Janet Charette?
> Q. Yes.
> A. You want to talk about Sharon - - Janet Charette? Janet Charette and Jim - - Jim is her - - her husband - - back about three years after she was living at my house, Jim Charette, her husband, come

10

> to me and said, Wallace, Sharon is collecting some money on your house. She's collecting some money for your house because she's coming to my - - see Janet Charette and to try to forge my name. I come to my house and I told that lady, I says, if you are collecting money from my place, you might as well quit it because I'm not filing that, and I says, I will not take the rap for that.

*Id.* 102:1-14.

### C. Rule 403 and the Charette Testimony

Contrary to assertions in Ms. Forest's motion, Mr. Bouchard did not testify that Mr. Charette told him about Ms. Forest engaging in "housing fraud" or that she "had solicited his wife, Janet Charette, to sign Mr. Bouchard's name to the ACAP documents." *Def.'s Mot.* at 4. Mr. Bouchard's actual testimony is much vaguer. He may have been referring to housing fraud and ACAP documents, but "collecting some money on your house" and trying "to forge my name" are not the same as "housing fraud" and forging "ACAP documents." *Compare Tr. of May 28, 2010 Hearing* 102:1-14, *with Def.'s Mot.* at 4. With the state of this record, the Court is unable to determine whether Mr. Bouchard's testimony would be "relevant in the litigation to establish a fact of consequence." *Beauchamp*, 986 F.2d at 4.

Further, even assuming Ms. Forest is correct—Mr. Bouchard's oblique references suggest he knew about Ms. Forest's theft of public money—it is not entirely clear why if Mr. Charette denies telling Mr. Bouchard about Ms. Forest's housing fraud, his denial advances her contention that Mr. Bouchard knew about her credit card fraud. As the Court pieces Ms. Forest's contention together, it runs:

11

1) Mr. Bouchard knew about and expressly condoned Sharon Forest's use of his name and credit to apply for and use credit cards in his name and she is therefore not guilty of aggravated identity theft;

2) His denial of his knowledge and approval of her credit card actions was part of a scheme by which he played the victim and blamed her in order to avoid criminal responsibility for his part in the ACAP fraud;

3) Contrary to his sworn testimony, Mr. Bouchard knew all along that Ms. Forest was engaged in ACAP fraud and he benefitted from the fraud because she paid some common household expenses with the fraudulently obtained money;

4) To prove Mr. Bouchard knew all along about the ACAP fraud and to impeach his credibility generally, Ms. Forest seeks to admit evidence that, contrary to his May 28, 2010 testimony, Mr. Charette did not tell Mr. Bouchard in either 1998 or 2000 that Ms. Forest was engaged in housing fraud;

5) Based on Mr. Charette's testimony, the jury could conclude that Mr. Bouchard was not telling the truth about learning about Ms. Forest's ACAP fraud from Mr. Charette and he was not telling the truth about warning Ms. Forest not to continue this fraud;

6) If Mr. Bouchard knew all along about the ACAP fraud and lied about it, his testimony is not credible; and,

7) If his testimony on this point is incredible, the jury could conclude that he is also not telling the truth about his knowledge of Ms. Forest's application for and use of credit cards in his name.

This string of logic quickly becomes more and more attenuated. First, by denying that he told Mr. Bouchard about Ms. Forest's ACAP fraud, Mr. Charette's testimony tends to prove that Mr. Bouchard did not know about Ms. Forest's ACAP fraud, so it is difficult to understand how Mr. Charette's denial is helpful to Ms. Forest's defense. Second, it assumes that if Mr. Bouchard is dishonest enough to condone Ms. Forest's theft from the Government to use the money in part for his benefit, he would approve of her taking money from him through the use of his credit. At the same time, Ms. Forest does have the argument that if Mr. Bouchard is willing to lie about his knowledge of the ACAP fraud, his testimony on the credit card charge is not worthy of belief, and the proposed testimony from Mr. Charette would presumably be extremely brief—namely, that he never told Mr. Bouchard anything about Ms. Forest perpetrating housing fraud.[5]

    Generally, the more direct (and less collateral) the relationship between the proferred evidence and the issues before the jury, the more probative and the more likely it will survive the relevancy balancing test under Rule 403. Here, the Court remains concerned about the relevance of the proferred testimony, its potential for confusing the jury about whether they are trying the ACAP case or the remaining

---

[5] This is at least what appears on the surface. It could be that there is much more about the relationship between Mr. Bouchard and the Charettes or between Ms. Forest and the Charettes than meets the eye and would require a substantial evidentiary diversion.

13

charges, and the leaps of logic that the defense is asking the jury to make about Mr. Bouchard's credibility.

The Court does not discount the Government's concerns about the collateral nature of the proposed testimony and as the issue is framed at trial, it may be necessary to exclude Mr. Charette's impeachment testimony. If the proffered testimony is collateral, "[i]t is well established that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter." *Beauchamp*, 986 F.2d at 3. The Court will seek to avoid "a trial within a trial on a collateral matter." *United States v. Thomas*, 467 F.3d 49, 56 (1st Cir. 2006).[6]

It is too early to make a definitive determination. Trials take on a life of their own and based on this record, it is premature to rule in or rule out Mr. Charette's impeachment testimony. At trial, before Ms. Forest seeks to admit Mr. Charette's testimony, the Court will require notice from defense counsel and may require a brief hearing outside the jury's presence. The determination, guided by *Catalan-Roman*, as to whether the "probative value" of Mr. Charette's testimony "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay [or] waste of time" must await trial. Fed. R. Evid. 403.

---

[6] The Court rejects the Government's contention that the admissibility of Mr. Charette's testimony is law of the case. The issue before the Court at the May 28, 2010 hearing was different from the issues that will be presented to the jury during trial, and the Court was not making a definitive evidentiary ruling in advance of trial.

14

## III. CONCLUSION

The Court DISMISSES Sharon Forest's Motion *in Limine* without prejudice (Docket # 138).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 3rd day of August, 2010